NORTHWEST THRESHER COMPANY, APPELLANT, V. MATEJ KUBICEK ET AL., APPELLEES.

FILED OCTOBER 22, 1908.  No. 15,315.

1. **Sales: CONTRACT: OFFER: ACCEPTANCE.** A mere uncommunicated purpose to accept an offer for the sale or purchase of property does not constitute an acceptance, and where parties are distant and the contract is to be made by correspondence, the writing of a letter or telegram containing notice of acceptance is not of itself sufficient to complete a contract. In such a case the act must involve an irrevocable element, and the letter must be placed in the mail, or the telegram deposited in the telegraph office for transmission, and thus placed beyond the power or control of the sender, before the assent becomes effectual to consummate a contract; and not then, unless the offer is still standing.

2. ——: COUNTERMAND OF ORDER. Where an order given for machinery contains a clause giving the vendor the right to accept such order or not as he pleases, and no time is fixed within which such acceptance shall be made, the vendee has the right, up to the time of acceptance, to countermand such order.

3. **Principal and Agent:** AUTHORITY OF AGENT. The facts stated in the opinion *held* ample to sustain the conclusion that plaintiff's representative, J. F. Hennessy, in his negotiations with defendants on July 11 and 12, 1904, had power to bind the plaintiff in that transaction.

APPEAL from the district court for Saline county: LESLIE G. HURD, JUDGE. *Affirmed.*

*Hastings & Ireland* and *S. B. McBeath,* for appellant.

*Ralph D. Brown* and *J. Reid Green, contra.*

FAWCETT, C.

Plaintiff instituted this suit in the district court for Saline county to foreclose a chattel mortgage, and for judgment upon three promissory notes described in said mortgage, which it claims were given to it by defendant Matej Kubicek in settlement for a traction engine and sundry attachments, which plaintiff claims said defendant Matej Kubicek and his son, Joe Kubicek, had ordered from plaintiff on June 9, 1904, in a written order, which provided for the delivery of said engine and attachments on board the cars at Crete, Nebraska. The defendants allege substantially that within two weeks subsequent to the giving of such order, and before the same had been accepted by plaintiff, they countermanded said order, but that, regardless of such countermand, plaintiff shipped said engine to Crete; that when it arrived at Crete defendants refused to accept it; that thereupon plaintiff sent one of its representatives, one J. F. Hennessy, to Crete, to attempt to make delivery of such engine; that defendants refused to receive the engine; that after somewhat extended negotiations it was agreed between Hennessy and defendants that Hennessy was to unload the engine and attachments, put them together, and deliver them to defendants on the farm of Matej Kubicek, about four and a half miles southwest of Crete; that, in consideration of that agreement, defendant Matej Kubicek

paid the freight on the engine, and signed the notes and mortgage in controversy; that said Hennessy thereupon proceeded to and did unload the engine from the car, attached the necessary parts thereto, and, in company with another employee of plaintiff, started with said engine for the farm of defendants; that when said Hennessy had proceeded about three-quarters of a mile from Crete, while attempting to cross a bridge, the bridge gave way and precipitated the engine and the two men who were upon it into the ditch below, a fall of about 18 feet, killing Hennessy and slightly injuring his companion; that on the next day Mr. E. W. Chambers, general manager of plaintiff for the state of Nebraska, called upon defendants and informed them of the accident which had happened on the previous evening; that Chambers then agreed that plaintiff would extricate the engine from the ditch, take it back to Crete, replace all broken parts, make the engine as good as ever, and deliver it to defendants upon their farm within five days thereafter; that in accordance with that agreement plaintiff did remove the engine from the ditch to Crete and expend considerable time, much more than five days, in trying to restore the engine to its former condition, but utterly failed to succeed in so doing; that plaintiff has never delivered the engine or any of the attachments to defendants as agreed, but at all times has had and still has possession of the same.

Plaintiff denies that Mr. Chambers ever made any such an agreement, and alleges that the only agreement he made was that, in consideration of the unfortunate circumstances, he would, as a matter of accommodation to defendants, and at plaintiff's expense, restore the engine to its former condition as soon as possible, and that when this was done defendants were to go to Crete and get the engine. Plaintiff also denies that Hennessy ever made the agreement claimed by defendants about delivering the engine to defendants' farm, and alleges that, if he did make such agreement, he had no authority so to do, and that plaintiff was not bound thereby. Plaintiff also al-

leges that it had accepted the order of defendants before it received any notice of an intention on the part of defendants to countermand the same.

The case was tried to the court, and a decree entered, in which the court found "for the defendants, and finds that the plaintiff has the property in controversy in its possession and ever has had, and the defendants or either of them never had possession thereof, and the foreclosure of the chattel mortgage in question is not plaintiff's remedy," and dismissed plaintiff's action without prejudice.

The principal questions involved, and the ones upon which the case must turn, are: (1) Did the defendants countermand their order of June 9 in apt time? If so, then the shipping of the engine and attachments, as was done, was without authority on plaintiff's part. (2) Did Hennessy agree to unload the engine and deliver it to defendants on defendants' farm? (3) Did Hennessy have authority to make such an agreement. We will consider these questions in the order named.

The evidence fairly shows that Jelinek & Company were the local representatives of plaintiff at Crete, and that Hennessy was a general salesman for plaintiff. Hennessy visited Crete on June 8, 1904, and in company with one of the Jelineks, their local agent, started out to canvass the country adjacent thereto. They made a sale to one Pawlish on June 8, and on the morning of June 9 called at the home of the Kubiceks, and as a result of that call obtained the signatures of the two defendants to an order for the machinery in controversy. This order expressly stipulated that it was not binding upon the plaintiff until accepted by plaintiff at its home office at Stillwater, Minnesota. Defendants claim and testify that after the order was signed, and just before he left, Hennessy told them they could have two weeks to think the matter over, and would have the right at any time within such two weeks to countermand this order. In this they are corroborated by Mr. Jelinek. Plaintiff contends that no such permis-

sion was indorsed upon the contract, and that Mr. Hennessy was without authority to in any manner vary the terms of the contract by parol. It is unnecessary to decide this point, for the reason that the uncontradicted evidence shows that on June 23 Mr. Kubicek, Sr., went to the place of business of the Jelineks, and stated to them that plaintiff had failed to ship the engine promptly as agreed, and that they would not now take the machine, and told Jelinek to either write or telephone plaintiff that the order was countermanded. Mr. Jelinek at once called up the general manager of plaintiff at his office in Council Bluffs, Iowa, and notified him of this countermand on the part of the Kubiceks. The general manager, Mr. Chambers, immediately wrote plaintiff as follows: "Council Bluffs, Iowa, June 23, 1904. Northwest Thresher Co., Stillwater, Minn. Gentlemen: On the 20th inst. we mailed you order of Matej and Joe Kubicek, Crete, Neb. We have just received a phone call from our agents S. Jelinek & Co., Crete, Neb., and they say that Kubicek was in and claims that he will not accept the engine now, that it was ordered to be shipped at once, and that it is too late now for him to take it. Of course, this is only a bluff, but we would suggest that you let us know by return mail whether or not you accept Kubicek's order, and send us settlement papers at once so that we can deliver the engine that is now at Crete, Neb. Yours truly, Northwest Thresher Company, E. W. Chambers, Mgr." It appears from this letter that Mr. Chambers held the order of the Kubiceks from the time it was executed, on June 9, until June 20 before he mailed it to the company at Stillwater. The order, as appears from the testimony of one of plaintiff's officers at the home office, was not received at Stillwater until June 22. The above letter of June 23 was received by the plaintiff at Stillwater on the next day, June 24, and on that day the company wrote to its manager at Council Bluffs the following letter: "June 24, 1904. Northwest Thresher Company, Council Bluffs, Ia. Gentlemen: We have your favor of the 20th, handing us

order dated June 9 of Matej Kubicek and Joe Kubicek for 16 H. Northwest straw burning engine, 150 ft. 8 in. 6 ply gendy belt, 14 bbl. steel mounted tank and cab. We accept the order, and will authorize you to take notes with interest from July 1st. If we fail to send you settlement made out in that way, remember that mortgage will have to be made out to correspond to the notes. Regarding the matter of tank pump and hose, we presume we are to get additional price for that, as it is not included in the order. As this order calls for delivery at once, and as the engine is on hand at Crete, presume there will be no immediate rush about getting settlement to you, as you say the engine may be held by the agent for a time to be further used as a sample. However, the settlement will get to you in the regular course of business at the earliest possible moment. Very truly, Northwest Thresher Company, per Sales Manager." The above letter is typewritten, and below the signature, written with a pen, is the following postcript: "P. S. Yours of the 23d at hand. Make them settle per order and no monkey work. Settlement papers go today."

It will be observed that this letter bears date June 24, the day after the Kubiceks countermanded their order, but the writer of the letter testified that he dictated the letter on the day previous, viz., June 23, which would be on the same day that Mr. Kubicek countermanded the order. Counsel for defendants express considerable doubt as to the truthfulness of this testimony. That fact we do not have to determine, for the reason that it is immaterial whether the letter was dictated on the 23d, or even written on the 23d, as the evidence is uncontradicted that it was not signed and mailed until the 24th, one day after plaintiff had been notified of the countermanding of the order by the Kubiceks. We think the law is well settled that "a mere uncommunicated purpose to accept an offer does not constitute an acceptance, and where parties are distant and the contract is to be made by correspondence, the writing of a letter or telegram containing a notice of

acceptance is not of itself sufficient to complete a contract. In such a case the act must involve an irrevocable element, and the letter must be placed in the mail, or the telegram deposited in the office for transmission, and thus placed beyond the power or control of the sender, before the assent becomes effectual to consummate a contract; and not then, unless the offer is still standing." *Trounstine & Co. v. Sellers,* 35 Kan. 447; *Averill v. Hedge,* 12 Conn. *424; *Peck v. Freese,* 101 Mich. 321. We must hold therefore, that the order given by the Kubiceks on June 9 for the machinery in controversy, which was not to become binding until accepted by the plaintiff at its home office at Stillwater, Minnesota, was countermanded by the defendants in apt time, viz., prior to the acceptance of that order by plaintiff, and that such countermand terminated all right of plaintiff to proceed thereunder. *Peck v. Freese, supra.*

As to the second point, the Kubiceks both testified that, when Mr. Hennessy came to their home on the evening of the day prior to the day of the accident, they refused to receive the engine, and that, as one of them put it, "Hennessy took himself off." On the next day Mr. Kubicek, Sr., went to Crete, arriving there early in the forenoon. After arriving there he had several interviews with Mr. Hennessy, at which one W. S. Chemlir acted as interpreter. Mr. Kubicek testifies that he persisted in his refusal to take the engine, but that finally it was agreed between himself and Mr. Hennessy that Hennessy was to unload the engine and deliver it to defendant on his farm, four and a half miles southwest of town; that, in accordance with and on the strength of that agreement, the papers were all prepared, and that he signed them at that time, but that the deal was not to be considered completed until Joe had signed the papers, which he told Hennessy Joe would do when the engine was delivered at the farm. One reason given by Mr. Kubicek why he insisted upon delivery at the farm was that he had had trouble once before by having an engine go through a bridge while it

was being driven from town to his farm. He admits that it is his signature to the receipt for the machinery, but he says the contents of the receipt were not made known to him, and that he did not know he was signing any such paper. Chemlir denies that Hennessy agreed to deliver the engine to defendants' farm, as the representative of plaintiff, but says that Hennessy agreed to do it as an accommodation to Kubicek. Hennessy is not alive to testify. Mr. Jelinek, however, the local agent of plaintiff, testified that after the notes and mortgage had been signed Hennessy brought them to him, and told him to take them to the bank and see if they were properly executed; that Hennessy told him that the settlement was not yet complete and would not be so until Joe had signed the papers; that Hennessy told him that he had made arrangements to unload the engine "and deliver it on the farm, and when they delivered it up there that Joe Kubicek will sign settlement." Thereupon Hennessy hired help, and at once proceeded to unload the engine and attach the necessary parts, after which he fired up, and in the evening, in company with the plaintiff's expert machinist, De Haas, started with the engine for defendants' farm. In the light of this testimony and this conduct on the part of Hennessy, we must hold that the contract between Hennessy and Mr. Kubicek was as claimed by the latter, and that Kubicek's agreement to take the engine if delivered at his farm was a sufficient consideration for Hennessy's agreement to deliver it.

This brings us to the third point, viz., did Hennessy have power to make this contract? It is urged by counsel for plaintiff that Hennessy was simply a salesman with authority to take orders, and that he had no authority beyond that. If so, why was he sent by plaintiff to Crete to represent plaintiff after the engine had arrived at that station? If the order had been properly accepted by plaintiff and was in full force and effect, then plaintiff had discharged its entire duty to defendants by shipping the engine to Crete, as by the terms of their order plaintiff

was only required to deliver the engine on board the cars at that point; so that there was nothing there calling for the services of a mere salesman. It is very evident that Mr. Hennessy was more than a mere salesman of plaintiff, with power only to take orders. When he went to Crete to adjust this particular matter, he possessed power to represent the plaintiff in that transaction. This is clearly shown by two letters mailed to him on July 10 and 11, which two letters were received and read in evidence without objection. The letter of July 10 reads as follows: "Council Bluffs, Iowa. 7-10-1904. J. F. Hennessy, Crete, Neb. Dear Sir: We wired you today to go to Crete and get mail. We found out yesterday that the engine shipped to S. Jelinek & Co. was still on the car. This is to fill the Mike Kubicek order. It is to have a cab on it, which is at Crete. We will have a man there in the morning to put it on. Now you have S. Jelinek & Co. pay the freight, unload the engine at once, and as soon as the cab is on notify Mike Kubicek that you are ready to deliver the engine to him on his order. You employ a good attorney, if necessary, and if he refuses outright to receive and settle for the machinery it will be necessary to sue him. He has never countermanded this order, and the order is straight, and we have been ready to deliver at any time. Will send you copy of order with this. If you find it necessary to keep Mr. De Haas, the man who will put on the cab, there to deliver the engine, do so. If not, let him come home as soon as he has the cab (word lost). If there is any demurrage on car, Jelinek & Co. should pay it, as Mr. Chambers called them up, and they said they would pay the (word lost), and unload the engine, which it seems they never have done. There is freight from here to Crete and $57 advance charges. The advance charges were not put on the bill of lading through oversight, but the agent here wired agent at Crete to collect the $57, and you see that it is collected with the fr't from Co. Bluffs to Crete. Jelinek & Co. told me over the phone that they see a lawyer, and he told them not to touch the engine.

But the writer can see no reason why they should not, as it is only consigned to them. You will know all about the deal much better than we can tell you, as you will be on the ground. And keep in mind that the machinery must be settled for by the purchaser as per the terms of the order he gave. Think Mr. Chambers has the settlement papers with him, and have told him to send to you at once to Crete, and you will doubtless receive them about the same time you receive this. Yours truly, Northwest Thresher Co., by C. Crocker." The letter of July 11 reads: "Co. Bluffs, Ia. 7-11-04. J. F. Hennessy, Crete, Neb. Dear Sir: Inclosed find settlement papers for the Kubicek engine. You will fill in all blanks for dates when they are signed. Have the mortgages duly signed and witnessed, sending the original to the Co. clerk with his fee 20c, also card inclosed. Have the purchaser's receipt properly dated, signed, and return all papers here. Be sure the numbers in the mortgage correspond with the numbers on machinery sold and delivered. Yours truly, Northwest Thresher Co., by C. Crocker." The duties which these letters called upon Mr. Hennessy to perform were greater than those of a mere solicitor or ordinary salesman. We do not see how any greater authority could have been given Mr. Hennessy under the circumstances than is given in the first of the two letters above set out. They very correctly say to Mr. Hennessy: "You will know all about the deal much better than we can tell you, as you will be on the ground." It is clear to our minds that Mr. Hennessy went to Crete on that occasion with as full power to represent the plaintiff as its general manager would have had if he had been personally present.

We do not deem it necessary to go into the details of what took place in the subsequent interviews between Mr. Chambers and the defendants. The uncontradicted evidence shows that plaintiff extricated the engine from the ditch, took it to Crete, attempted to restore it to its former condition, and furnished all necessary parts for so doing, and all at the expense and cost of plaintiff; that the ma-

chine is still in Crete, where plaintiff's agents left it, and that it never has been in the possession of the Kubiccks for a single moment of time.

A number of minor questions are discussed in the briefs of counsel which we do not deem it necessary to consider.

We recommend that the judgment of the district court be affirmed.

CALKINS and ROOT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.